U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY 1 5 2012

CLERK, U.S. DISTRICT COURT
By_____
                    Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

PETER HELLMUTH EGGERT,            §
                                  §
              Petitioner,         §
                                  §
v.                                §        No. 4:11-CV-495-A
                                  §
TOMMY BRYANT, Sheriff,            §
Erath County, Texas,              §
                                  §
              Respondent.         §

## MEMORANDUM OPINION
### and
### ORDER

This is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, Peter Hellmuth Eggert, a state prisoner currently incarcerated in Lindsey State Jail, in Jacksboro, Texas, against Tommy Bryant, Sheriff of Erath County, Texas, respondent.[1]  After having considered the pleadings, state court records, and relief sought by petitioner, the court has concluded that the petition should be denied.

_____

[1]At the time this petition was filed, petitioner was incarcerated in the Erath County jail, however the TDCJ online "Offender Information Search" website indicates that, as of this date, petitioner is no longer in custody of respondent and is confined at the Lychner Unit located at 2350 Atascocita Road, Humble, Texas 77396.  Nevertheless, petitioner receives his mail at a PO Box in San Antonio, Texas.  Neither party has filed a motion to substitute respondent.

## I.   Factual and Procedural History

In 2005 petitioner was indicted for conspiring with his son, Mikel Peter Eggert, to fabricate physical evidence in an ongoing appellate proceeding, in violation of § 37.09 of the Texas Penal Code.   (Clerk's R. at 1)[2]  TEX. PENAL CODE ANN. § 37.09 (Vernon 2011).   Specifically, the indict alleged that petitioner on or about April 5, 2004—

> did then and there, with intent to commit the felony
> offense of fabricating physical evidence, agreed with
> Mikel Peter Eggert that one of them would engage in
> conduct that would constitute said offense, to-wit:
> the said Peter Hellmuth Eggert, knowing that an
> official proceeding was pending, entitled Marcos
> Gallardo v. State of Texas, made, presented or used a
> record or document, to-wit:  the purported affidavit of
> Kim Whiteley, or Michelle Whiteley, with knowledge of
> its falsity and with intent to affect the outcome of
> the official proceeding described above.

(*Id.*)

On June 14, 2005, a jury found petitioner guilty of the offense, and the trial court assessed his punishment at two years' confinement in a state jail facility, probated for five years,[3] a $5,000 fine, and thirty days in jail.   (Clerk's R. at

---

[2]"Clerk's R." refers to the court record in petitioner's state trial proceedings in Case No. CR12121.

[3]Petitioner's term of community supervision has since been revoked.  *Eggert v. State*, 2010 WL 4668956, at *1.

49)   Petitioner appealed his conviction, but the Eleventh Court of Appeals of Texas affirmed the trial court's judgment, the Texas Court of Criminal Appeals refused his petition for discretionary review, and the United States Supreme Court denied writ of certiorari. *Eggert v. State*, No. 11-05-00234-CR, 2007 WL 1644580 (Tex. App.–Eastland June 7, 2007) (not designated for publication); *Eggert v. State*, PDR No. 1326-07; *Eggert v. State*, 555 U.S. 1044 (2008).

Petitioner also filed a state habeas application for writ of habeas corpus under article 11.072 of the Texas Code of Criminal Procedure challenging his conviction, which was denied by the trial court, the denial was affirmed by the Eleventh Court of Appeals, and petitioner's petition for discretionary review was refused by the Texas Court of Criminal Appeals. TEX. CODE CRIM. PROC. ANN. art. 11.072 (Vernon 2005); *Eggert v. State*, No. 11-10-00004-CR, slip op., 2010 WL 4668956 (Tex. App.–Eastland Nov. 18, 2010); *Eggert v. State*, PDR No. 512-10. This federal petition for writ of habeas corpus followed.

In its brief on appeal, the state set forth the factual summary of the case as follows:

> In September 1999, Marcos Gallardo was charged, and later indicted in the 266th Judicial District Court of Erath County, for the aggravated sexual assault of a

3

child, Michelle Whiteley, and for indecency by contact
with the same child.  Law enforcement had obtained a
confession from Gallardo and sworn documents from the
victim, the victim's mother, Kim Whiteley, and an aunt
who were there at the time of the offense.  The
confession and all statements given were consistent
with the offense having occurred.  Gallardo signed a
stipulation of evidence and pled guilty to indecency
with a child by exposure.  Gallardo was placed on ten
years of deferred adjudication probation.  At the time
of his plea and sentencing, Gallardo was not a United
States citizen.  On or about February 14, 2003, the
Immigration and Naturalization Service detained
Gallardo for deportation based on his commission of
indecency with a child.

[Eggert] received legal training in Germany prior
to his arrival to the United States.  During the period
relevant to this case, [Eggert] was not licensed to
practice law in Texas state courts or authorized to
represent others in federal courts, but he could
represent himself in federal court.  [Eggert's] son,
Mikel Eggert, was licensed to practice law in the
Commonwealth of Pennsylvania and in federal courts.
Mikel Eggert was not licensed to practice law in Texas
state courts.  Around November of 2003, [Eggert] and
Mikel Eggert engaged in the representation of Gallardo
in efforts to block his deportation.  [Eggert] appeared
on behalf of Gallardo in the INS courts in San Antonio
and filed statements of request for assistance.

[Eggert] was not having success fighting
Gallardo's deportation.  Around January 5, 2004,
[Eggert] and Mikel Eggert met with Jason Cashon who is
the Assistant District Attorney for Erath County.  The
Eggerts (Appellant and Mikel) met with Cason at his
office and related that if they could get Gallardo's
conviction set aside Gallardo might not get deported.
Cashon informed the Eggerts that the only way to get
Gallardo's conviction set aside would be to obtain a
finding of actual innocence.  The Eggerts informed
Cashon of their strategy to file a motion to revoke or
revise Gallardo's probation in an effort to block

4

deportation.  Because the Eggerts' representation of
Gallardo was going to require the practice of law in a
state court, and because the Eggerts knew they had to
have a Texas-licensed attorney to talk to Cashon about
relief for Gallardo, Mikel Eggert solicited an
association with a Texas-licensed attorney in Austin,
Joe Lopez, whom he knew from law school.  Mikel Eggert
and Lopez met with Cashon a couple of days after the
initial meeting.  During this meeting Mikel Eggert and
Lopez told Cashon the same story.  Lopez also said that
he did not know a lot about what was going on and that
Mikel was really going to be doing the work.  Lopez
thereafter signed off on the Eggerts' paperwork because
neither of the Eggerts was licensed to practice law in
Texas state courts.  Pleadings were submitted under the
name of The Eggert Law Firm, P.C., and Mikel Eggert did
sign Lopez's name on pleadings filed in this Honorable
Court in the Gallardo appeal.  Cashon informed Mikel
Eggert and Lopez of the possible consequences of filing
a motion to revoke or revise probation and further
advised them of the procedural aspects of filing an
Article 11:072, CCP, writ of habeas corpus, which is to
be filed in state district court.  Cashon testified
that in January Mikel implied that "they" had talked to
the witness and that she was not going to testify
again.

    Lee Roy Gaitan testified at [Eggert's] trial and
is the former Dublin Chief of Police who was both
familiar and involved with the Gallardo sexual assault
investigation.  Gaitan was contacted on three occasions
by an acquaintance, Pedro Padilla, who asked Gaitan
whether he had been contacted by an attorney named
Peter that wanted to talk to Gaitan about a case that
happened in Dublin when he was employed there as Chief
of Police.  Shortly thereafter, [Eggert] called Gaitan
and requested a meeting.  Gaitan met with [Eggert] and
Mikel Eggert the next day at their office.  [Eggert]
indicated to Gaitan that he knew Gaitan was running for
office in Erath County, and intimated that it would be
hard for Gaitan, as a Hispanic, to win the election in
Erath County.  Gaitan testified that he was almost
certain [Eggert] identified himself as an attorney and

that [Eggert] told him that [Eggert] was representing some people in immigration. Gaitan testified that he was under the impression that both [Eggert] and Mikel Eggert were attorneys. Gaitan testified that it was apparent to him during this initial meeting Mikel Eggert knew why Gaitan was there and asked [Eggert] if he needed any help.

During their first meeting, [Eggert] asked Gaitan if he remembered Gallardo. [Eggert] explained Gallardo's situation and asked Gaitan to help [Eggert] prevent Gallardo's deportation. [Eggert] told Gaitan that Gallardo had done wrong and that [Eggert] was not disputing that he did wrong, but that Gallardo was going to be deported and [Eggert] was preparing something where Gallardo could possibly serve prison time to prevent the deportation. [Eggert] asked Gaitan if he knew the victim's mother and told Gaitan that [Eggert] had spoken with Cashon who told [Eggert] that he needed to talk with the mother to see what she could do about dropping the charges. Cashon, however, testified that he never told the Eggert[s] that they needed a witness recantation. [Eggert] told Gaitan that [Eggert] was going to prepare some documents for submission to the Board of Pardons and Parole, and that he wanted Gaitan to sign one of the documents. [Eggert] also offered to put one of Gaitan's campaign signs at his office and suggested that they could look into using an establishment called Silver River for Gaitan's campaign benefit. Gaitan agreed to sign the document for the Board of Pardons and Parole, and [Eggert] agreed to check on the use of the Silver River for Gaitan's campaign benefit.

On January 15, 2004, the Eggert[s], through Lopez filed an 11.072 writ in the 266th Judicial District Court. Judge Jones denied the writ, finding that the writ was frivolous and groundless. Cashon testified that the only remaining remedy at that point, for the Eggerts to help Gallardo, was a direct appeal to the Court of Appeals for the Eleventh District in Eastland, challenging Judge Jones' findings on the writ. On February 13, 2004, the Eggerts filed a notice of appeal

challenging Judge Jones' findings, which notice was docketed in this Honorable Court's cause number 11-04-00049-CR.  Said cause remained pending through September 30, 2004, when the judgment of the trial court was affirmed.

In February 2004, [Eggert] called Gaitan and asked him to come to his office to sign the document that was to be used to help Gallardo, which was to be a statement from Gaitan.  On February 17, 2004, Gaitan stopped by [Eggert's] office and signed the statement, however, Gaitan did not thoroughly read it.  Gaitan later read the statement and learned that it contained false information.  During this meeting, [Eggert] again raised the issue of Kim Whitley.  Gaitan told [Eggert] that he knew Kim Whiteley and that maybe she can help him.  Gaitan testified that at that time he did not know exactly what [Eggert] wanted, but thought that maybe [Eggert] wanted Kim Whiteley to sign a document as he did, recommending that Whitley was willing to help.

On March 22, 2004, Gaitan met with Armand, the person in charge of the Silver River, to talk about his campaign fliers.  While there, [Eggert] came out of a nearby trailer to meet with Gaitan.  [Eggert] took Gaitan into his trailer and presented him with a check for $100 that he represented as a campaign contribution.  Gaitan, however, became suspicious because two or three times [Eggert] stated to him that the $100 was not a bribe for Gaitan's assistance.  [Eggert] handed Gaitan a folder that contained some papers.  The papers were prepared as affidavits of Kim Whitley and her daughter, Michelle Whiteley.  [Eggert] told Gaitan that he wanted Gaitan to find Kim Whitley, have her sign the papers in front of a notary, and hold on to the papers until she could return them to [Eggert].  As Gaitan walked out of the trailer, [Eggert] told Gaitan that when he finds Kim Whitley, tell her that the Gallardos have funds available and will make it worth her while.  Gaitan testified that he told [Eggert] that it was not right.  Gaitan testified that [Eggert] then told him not to worry about it, that

"it's not you . . . it's the family, . . . you can't
afford to get in trouble . . . ." Gaitan then said,
"Well . . . it's not right," and [Eggert] again said
that it would not be coming from Gaitan.  Gaitan
testified that [Eggert] wanted Gaitan to get the papers
signed by Michelle and Kim Whitley, and that [Eggert]
stated that he was going to file some more papers with
another court.  Gaitan testified that [Eggert] told him
that time was running short and that he needed to get
them done.  Cashon had testified that the Eggerts'
brief on direct appeal (in the Gallardo) appeal was due
April 5, 2004.  Gaitan testified that he left with the
folder but made no effort to contact Kim Whitley.
Gaitan testified that when he left on March 22, 2004,
he remained under the impression that [Eggert] was an
attorney because [Eggert] had stated that day that he
had made some money taking some depositions.  After
March 22, 2004, [Eggert] began calling Gaitan on a
daily basis, telling Gaitan to give the affidavits to
Kim Whitley and make sure she and Michelle sign the
affidavits before a notary.  When asked on direct
examination whether [Eggert] told Gaitan that [Eggert]
had never talked to Kim Whitley before drafting the
documents, Gaitan testified that he did not recall, but
that it was apparent [Eggert] had not done so, due to
[Eggert's] questions to Gaitan about Kim Whitley,
whether he knew Kim Whitley, and whether Gaitan could
talk to her.

On March 31, 2004, three days before Gaitan's
April 3rd fundraiser, Gaitan met with Kim Whitley and
told her that an attorney wanted to talk to her about
her daughter's incident and that he had been sent over
with papers for Kim Whitley to sign.  Gaitan testified
that he opened up the folder that contained the papers
and the $100 check, and a "red light went off in
[Gaitan's] head . . . ."  Gaitan testified that he
realized that "this" is why [Eggert] gave him the $100
check.  Gaitan testified that up to that point he had
only glanced at the papers, but he went through them
thoroughly that day.  Gaitan testified that the wording
in the papers was such that Kim Whitley would have had
to have seen before she could agree to, because the

8

papers said Kim Whitley did not agree with what had
happened [in the Gallardo case.]   Gaitan testified that
he knew the affidavits were not true and that he closed
the folder and did not give the affidavits to Kim
Whiteley.   Gaitan testified that he did not give the
documents to Kim Whiteley because he knew they were
false.   Gaitan testified he was scared and knew he had
already gotten himself in deep.   Gaitan testified that
he proceeded to tell Kim Whiteley that [Eggert] had
been trying to get in touch with her and that Gaitan
had some papers for her, but that Kim would have to
talk to [Eggert].   Gaitan testified that he also told
Kim Whitley that [Eggert] said the Gallardos have funds
to make it worth her while, i.e., for signing the
papers and helping them out, but that Gaitan did not
want anything to do with that.   Gaitan obtained Kim
Whitley's permission to give [Eggert] her phone number,
and told [Eggert] that he had not given the papers to
Kim Whitley.   Gaitan testified that he told [Eggert]
that he had mentioned the available funds to Kim
Whiteley, and [Eggert] stated, " . . . you got to be
careful with this, . . ., because . . ., I can get in
trouble or we can . . . you know, don't need the
problems . . . ."   Gaitan testified that when he
clarified to [Eggert] that [the funds] were strictly
between [Eggert] and Kim Whitley, [Eggert] said
something about maybe Gaitan was not wanting to do
anything as far as helping, and maybe Gaitan figured
out that the $100 was really for him having Kim Whitley
sign the papers.   Gaitan ended up throwing the
documents in the trash and later retrieved and provided
them to Ranger Joe Huston on April 5, 2004.

Kim Whiteley testified at trial that she met with
Gaitan on March 31, 2004.   Gaitan told Whiteley that
Gallardo hired some lawyers that wanted to know if
Whiteley would look at some papers and talk to her
daughter concerning Whiteley changing her statement
about what Gallardo had done to Michelle.   Gaitan told
Whiteley that the lawyers wanted Whiteley to drop the
charges and sign a form saying the sexual assault never
occurred.   Gaitan told Whiteley that [Eggert] would be

calling her.

That same day, [Eggert] called Whitley and
identified himself as an attorney for the Gallardos.
[Eggert] wanted to know if Whiteley would come out and
talk to him about the case.  Whiteley and her
husband-to-be drove out to meet with [Eggert].  Once
there, [Eggert] asked Whitley if she remembered what
happened with her daughter and Whiteley began to relate
the incident to [Eggert].  Whiteley testified that
[Eggert] began to get upset and stated that the (sic)
told Whiteley that he did not want to hear what
happened, he just wanted to "get this fixed."  Whiteley
testified that [Eggert] Wanted Whitley and her daughter
to sign affidavits dropping the charges.  Whiteley
testified that Mikel Eggert was there during this
meeting and typed up the statements that [Eggert]
wanted signed.  Whiteley testified that the papers were
given to her and [Eggert] asked her to take the papers
to her daughter, to read them and have them signed.
[Eggert] also gave Whiteley $20 for gas.  Whiteley
testified that [Eggert] and Mikel Eggert told her they
would give her anything that she wanted if she would
take the papers and get them signed, and that if she
needed more money it was available.

Whiteley left the office and read the papers.
Whiteley testified that neither she nor her daughter's
affidavit contained true statements.  Whiteley
testified that she did not know where the lies came
from, but that she had not given the Eggerts the
information.  Whiteley spoke to [Eggert] the next day
and told him she did not feel that the affidavits were
truthful and that she was not comfortable even talking
to her daughter about it.  Whiteley testified that she
expressed concern to [Eggert] about her daughter and
her going to jail if they were lying and signed the
papers, to which [Eggert] replied that no one was going
to jail, no one would ever see the papers and nobody
would know anything.  Whiteley testified that [Eggert]
made the statement that "we don't want no lying,"
however Whiteley was unsure who the "we" referred to.

10

Whiteley testified that she told [Eggert] that she
wanted to drop the whole thing, that she did not want
to talk to [Eggert] any more, and that she did not want
[Eggert] bothering her any more.  Whiteley testified
that [Eggert] told her he would continue to call her
until she went and talked to her daughter.

Whiteley then took the papers to her attorney,
Jason Johnson, who arranged a meeting with Ranger Joe
Hutson.  Saturday morning, April 3, 2004, [Eggert]
again called Whiteley and asked Whiteley if she went
and got her daughter and son, to bring them to
Stephenville, that [Eggert] really needed to talk to
them.  [Eggert] told Whiteley that he would continue to
call her until she brought her daughter [to see
(Eggert)].

Later, on April 3, Gaitan spoke to [Eggert] at his
campaign benefit.  [Eggert] told Gaitan that he had met
with Kim Whiteley and that he thought Whiteley was
getting "cold feet," and [Eggert] wanted Gaitan to meet
with her.  The following day Gaitan again met with
Whiteley who informed Gaitan, "these guys are not real
attorneys."  Whiteley told Gaitan that she had taken
the papers to her lawyer who was going to contact
Ranger Hutson.  Gaitan testified that Whiteley also
told him that [Eggert] had been pestering and
intimidating her, and possibly said he made threats.
Whiteley told Gaitan that she was not going to sign the
papers because they were false, but that [Eggert]
wanted her to sign them anyway.  On April 5, 2004,
Ranger Hutson obtained the papers that had been given
to Whiteley and to Gaitan.

(Resp't Resp. at 4-11 (citations to the record omitted))

### D.   ISSUES

Petitioner's claims are multifarious and are addressed as

thoroughly as practicable.  Generally, he raises four grounds for

habeas relief:

"(1)  Unlawful seating of jury;
(2)   Ineffective assistance of counsel;
(3)   Prosecutorial misconduct and extreme judicial bias; and
(4)   Actual innocence."

(Pet. at 6-7, 11-20)

## E.   RULE 5 STATEMENT

Respondent believes that one or more of petitioner's claims have not been properly exhausted in state court and are procedurally barred.   (Resp't Ans. at 12)

## F.   DISCUSSION

### Legal Standard for Granting Habeas Corpus Relief

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless he shows that the prior adjudication:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court.  28 U.S.C. § 2254(d).  A decision is contrary to clearly established federal

12

law if the state court arrives at a conclusion opposite to that reached by the Supreme Court of the United States on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). A state court decision will be an unreasonable application of clearly established federal law if it correctly identifies the applicable rule but applies it unreasonably to the facts of the case. *Williams*, 529 U.S. at 407-08.

The Act further requires that federal courts give great deference to a state court's factual findings. *Hill*, 210 F.3d at 485. Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). When the Texas Court of Criminal Appeals denies relief in a state habeas corpus application without written order, it is an adjudication on the merits, which is entitled to this presumption. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal

13

court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied.  *Townsend v. Sain*, 372 U.S. 293, 314 (1963)[4]; *Catalan v. Cockrell*, 315 F.3d 491, 493 n.3 (5th Cir. 2002).

### 1.  *Procedural Default*

Under his first ground, petitioner claims, in violation of article 35.20 of the Texas Code of Criminal Procedure, the trial court clerk did not seat the venire panel in the order of the list furnished to the defense but, instead, allowed the venire to seat themselves wherever they desired.  Petitioner further claims the clerk then presented "a **new** and **second** petit jurors list (not file stamped and/or otherwise <u>authenticated</u>) **after** *voir dire* with the remark "Shuffled," where nowhere in the record appears any indication that a request, as required by state law, was made for a shuffle.  (Pet. at 11-12) (emphasis in original)

Petitioner raised this claim in "Appellant's Supplemental Motion for Rehearing," which was denied, in the Eleventh Court of Appeals following that court's affirmance on direct appeal, in

---

[4]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d).  *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

his subsequent petition for discretionary review, in his motion
for rehearing of the refusal of his petition for discretionary
review, in his petition for writ of certiorari, and in his state
habeas application.  (State Habeas R. at 12-17, 110, 115-19, 121-
22)  However, the claim could and should have been raised in his
original submission, or "opening brief," on appeal but was not.
Thus, on state habeas review, the state argued the claim was not
cognizable on habeas review and should be denied summarily as
frivolous.  (State Habeas R. at 82-83)  In accordance with the
state's recommendation, the state habeas court found the claim
failed to present a claim of error that is cognizant on a writ of
habeas corpus and was frivolous.  (*Id.* at 152)

Similarly, under his third ground, petitioner claims
prosecutorial misconduct and extreme judicial bias on the basis
that, after the inexplicable recusals of the elected trial judge,
Donald Jones, the elected district attorney, John Terrill, and
the assistant district attorney, Jason Cashon, senior judge David
Cleveland was assigned to his case, who in turn appointed Garry
Lewellen as "special prosecutor."  (*Id.* at 7, 14)  Petitioner
asserts that this appointment was nothing more than "cronyism"
and that Judge Cleveland and Lewellen have perpetrated, in
concert and under color of law, "outrageously gross injustice."

15

(Pet. at 15)  He urges the most "excessive violations" relate to the prosecutor's closing argument, the violation of the attorney/client privilege, the violation of double jeopardy, the violation of his right to a speedy trial, the prosecution of his case even though it was committed outside the court's jurisdiction, the addition of excessive probationary provisions and conditions, and retaliation in response to his motion to disqualify/recuse the judge and prosecutor.  (*Id.* at 15-16)

Petitioner raised one or more of his prosecutorial-misconduct and judicial bias claims for the first time in his motion for new trial and then later in his motion for rehearing following the appellate court's affirmance on direct appeal, in his state habeas application, and/or in this federal petition. (State Habeas R. at 27-32, 69-70 138-42)

To the extent his claims were first raised in his motion for new trial, motion for rehearing, and state habeas application, the claims were previously litigated or could have been raised in his original submission, or "opening brief," on appeal but were not.  Thus, on state habeas review, the state argued the claims were not cognizable on habeas review and should be denied summarily as frivolous.  (State Habeas R. at 85-86)

The state habeas court found that facts relevant to these claims were known, or through diligence should have been known, by petitioner at the conclusion of his trial and/or were previously litigated in post-trial and direct appeal proceedings. Thus, in accordance with the state's recommendation, the state habeas court concluded the claims failed to present a claim of error that were cognizant on a writ of habeas corpus and were frivolous. (*Id.* at 150, 152)

In turn, the Eleventh Court of Appeals overruled the claims under both ground one and ground two stating:

> Article 11.072 provides that a person may not seek relief by way of a petition for writ of habeas corpus if he could have obtained the requested relief by means of a direct appeal. [Petitioner]'s . . . issues all raise arguments that should have been and were raised during direct appeal.

*Eggert*, 2010 WL 4668956, at *1. *See also* TEX. CODE CRIM. PROC. ANN. art. 11.072, § 3(a).

Ordinarily, a state prisoner seeking federal habeas relief must first exhaust available remedies in the state courts in a procedurally correct manner, thereby affording those courts "the first opportunity to address and correct alleged violations of [the] prisoner's federal rights." 28 U.S.C. § 2254(b)(1)(A); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Deters v. Collins*,

985 F.2d 789, 795 (5th Cir. 1993). The adequate-and-independent-state-ground, or procedural default, doctrine furthers that objective, for without it, "habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court." *Walker v. Martin*, - U.S. -, 131 S. Ct. 1120, 1127-28 (2011); *Coleman*, 501 U.S. at 732. Under this doctrine, a federal court may not consider a state prisoner's federal habeas claim when the last state court to consider the claim expressly and unambiguously based its denial of relief on an independent and adequate state procedural default. *Walker*, 131 S. Ct. at 1127; *Coleman*, 501 U.S. at 729.

Under Texas law, it is well-settled that the writ of habeas corpus should not be used to litigate matters which could and should have been timely and properly raised on direct appeal, but were not. (State Habeas R. at 76) *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996). *See also Rochelle v. State*, 791 S.W.2d 121, 124-25 (Tex. Crim. App. 1990) (providing appellate issue raised for the first time on rehearing is generally waived and not preserved for review by Court of Criminal Appeals). This state procedural rule is an adequate state ground capable of barring federal habeas review. *Scheanette v. Quarterman*, 482 F.3d 815, 827 (5th Cir. 2007); *Busby v. Dretke*, 359 F.3d 708, 719

(5th Cir. 2004).

In this case, the state courts clearly relied upon this firmly established and regularly followed state procedural rule in rejecting petitioner's grounds one and three. This represents an adequate state procedural bar to federal habeas review, absent a showing of cause and prejudice or a resulting fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750 (providing valid cause requires a showing "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule"); *Schlup v. Delo*, 513 U.S. 298, 324 (1995) (providing, to be credible, a petitioner must support a claim of actual innocence with new reliable evidence that was not presented at trial); *Brewer v. Quarterman*, 466 F.3d 344, 347 (5th Cir. 2006). Such showing not having been demonstrated by petitioner, the claims are barred from this court's review.

To the extent petitioner's claims in this federal petition exceed the scope of the claims presented in the state courts the claims are unexhausted. Under the Texas abuse-of-the-writ doctrine, however, petitioner cannot now return to state court for purposes of exhausting the claims. TEX. CODE CRIM. PROC. ANN. art. 11.072, § 9. The abuse-of-the-writ doctrine represents an

adequate state procedural bar to federal habeas review. *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997). Therefore, absent a showing of cause and prejudice or a miscarriage of justice, such showing not having been demonstrated, petitioner's claims under ground four raised for the first time in this federal petition are procedurally barred from this court's review. *Smith v. Johnson*, 216 F.3d 521, 523-24 (5th Cir. 2000).

### 2. *Ineffective Assistance of Counsel*

Petitioner claims he received ineffective assistance of trial counsel. A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984). An ineffective assistance claim is governed by the familiar standard set forth in *Strickland v. Washington*. 466 U.S. at 668. To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Id.*

A court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional

assistance or sound trial strategy. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689.

Where a petitioner's ineffective assistance claims have been reviewed on the merits under the *Strickland* standard and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of *Strickland*, or if the state courts' decision is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *Haynes v. Cain*, 298 F.3d 375, 379-82 (5th Cir. 2002).

Petitioner was represented at trial by Andrew Ottoway, an experienced criminal defense attorney. Petitioner claims counsel was ineffective because he (1) informed petitioner that the defense investigator had a "homosexual encounter" with counsel's son, was fired, and had not served witness subpoenas or been replaced, leaving the defense with no witness testimony, (2) disclosed to petitioner that the "elected and recused District Attorney" had offered him a position with the D.A.'s office after

the conclusion of the trial, although he had an ethical duty to inform the trial judge of such offer but did not, (3) refused to "shuffle" the jury venire even though he realized various anomalies in the seating of the panel at petitioner's request, (4) failed to object to "opinion testimony from fact witness and/or prosecutor, recused Asst. D.A. Jason Cashon, of ultimate questions of guilt," request a jury instruction regarding state witness Lee Roy Gaitan's status as an accomplice witness, object to the jury foreperson who admitted that she was the daughter of a grand juror, "substantially" interview the state's witnesses, and understand applicable law to his case; and (5) failed to secure an "instruction setting forth" a defense under § 37.09 of the Texas Penal Code regarding the exception for documents, records or things that are privileged or work product. (Pet. at 6, 13-14)

Claim (5), wherein petitioner asserts counsel was ineffective by failing to secure an "instruction setting forth" a defense under § 37.09 of the Texas Penal Code, was raised on direct appeal. Section 37.09 states in relevant part:

(a) A person commits an offense if, knowing that an investigation or official proceeding is pending or in progress, he:

. . .

　　(2) makes, presents, or uses any record, document,
or thing with knowledge of its falsity and with intent
to affect the course or outcome of the investigation or
official proceeding.

(b)  This section shall not apply if the record,
document, or thing concealed is privileged or is the
work product of the parties to the investigation or
official proceeding.

TEX. PENAL CODE ANN. § 37.09(a)(2), (b) (Vernon 2011).

　　The state appellate court addressed the issue as follows:

1. *Work Product.*

　　TEX. PEN. CODE ANN. § 37.09 . . . prohibits
tampering with or fabricating physical evidence, but
the statute does not apply "if the record, document, or
thing concealed is privileged or is the work product of
the parties to the investigation or official
proceeding."  Peter argues that the Whiteley affidavits
were work product, that the statutory exception
applies, and that the evidence was, therefore, legally
insufficient.

　　Section 37.09 proscribes several different methods
of tampering with or fabricating physical evidence, but
the work-product exception by its terms only applies to
records, documents, or things concealed.  Peter was
indicted for conspiracy to make, present, or use false
affidavits.  The exception is inapplicable.

*Eggert*, 2007 WL 1644580, at *1-2 (citations omitted).

　　Accordingly, the court went on to conclude that the trial
court did not err by refusing to submit an instruction on the

work-product defense, and its holding rendered petitioner's
ineffective assistance claim moot.  *Id.* at *4-5.

A federal court must defer to a state court's interpretation
of state law.  *Fierro v. Lynaugh*, 879 F.2d 1276, 1278 (5th Cir.
1989).  *See also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We
have repeatedly held that a state court's interpretation of state
law, including one announced on direct appeal of the challenged
conviction, binds a federal court sitting in habeas corpus.");
*Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991) (holding courts
"look through" discretionary-review refusal to determine if claim
was adjudicated on the merits in applying § 2254(d) standard of
review); *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999)
(applying a presumption of correctness to intermediate appellate
court decision that adjudicated claim on the merits).  Applying
the appropriate deference, the state court's decision is not
contrary to, or involve an unreasonable application of,
*Strickland*.

Petitioner's remaining ineffective-assistance claims were
raised in his state habeas application.  The state habeas judge,
who also presided over petitioner's trial, conducted a hearing by
affidavit.  In his affidavit, trial counsel responded to the

allegations as follows:

I was appointed by Senior Judge David Cleveland,
sitting by assignment, in the 266th Judicial District
Court of Erath County, Texas, to represent Peter
Hellmuth Eggert in his three felony cases pending in
that Court.  The three cases included Cause CR12013,
Tampering with a Witness, Cause CR12121, Criminal
Conspiracy – Fabricating Physical Evidence, and Cause
CR12122, Bribery.  Peter Eggert's Cause CR12121 was
consolidated for trial with the case charging his son,
Mikel Peter Eggert, with the same offense, based on the
same facts and circumstances.

.   .   .

I am knowledgeable of felony and misdemeanor criminal
laws and procedures, and, specifically, I am
knowledgeable of the criminal laws applicable to the
offense made the basis of Mr. Peter Eggert's conviction
in Cause CR12121.

At the beginning of the trial in Cause CR12121, the
jury panel was properly shuffled and seated and
thereafter a list of jury panel members was provided to
the defense.  Peter Eggert and I discussed the issue of
requesting a shuffle, and, as trial strategy, the two
of us agreed to proceed without requesting a shuffle,
after a review of the jury information cards provided.

Mr. John Terrell, who was the former elected District
Attorney for Erath County, and I, at some pointed
discussed the possibility of my potential employment
with the District Attorney's office.  As of the time of
the trial, I had not been offered or accepted any
employment with the District Attorney's office.  I did
advise my client of same and he voiced no concern or
objections.  Such potential employment was speculative
at the time of trial and had no effect upon my
representation of Mr. Eggert or my performance as his
attorney.  Subsequently I did work for the District
Attorney's office for a relatively short period of
time, which period occurred in the year following the

trial in Cause CR12121.

Finally, in response to allegations regarding my family and office personnel, one of my employees that worked for me ceased to be employed by my firm; however, his cessation of employment, and the matters incident thereto, where [sic] not at the time of the preparation and trial of Cause CR12121 [and] had no bearing on my job performance.

I personally contacted and interviewed all of the State's witnesses who would talk with me. Additionally, until punishment was assessed, my client was in full agreement with me regarding trial strategy, our witnesses actually used at trial, and those we elected not to testify.

(State Habeas R. at 146-47)

Based on his own personal recollections of counsel's actions, the state court record,[5] and counsel's affidavit, the state habeas judge entered the following relevant findings of fact:

18.   Based on the credible affidavit of Attorney Andrew Ottaway, the cessation of employment of one of Mr. Ottaway's employees, and the matters incident thereto, did not occur at the time of the preparation and trial of Cause CR12121 and had no bearing on his job performance.

19.   Based on the credible affidavit of Attorney Andrew Ottaway, Mr. Ottaway's potential employment with the District Attorney's office was speculative at the time of trial and had no effect upon his

---

[5]The state did not provide a copy of the reporter's record of the state trial proceedings.

representation of Mr. Eggert or his performance as Mr. Eggert's attorney.

20. Based on the credible affidavit of Attorney Andrew Ottaway, at the beginning of the trial in Cause CR12121, the jury panel was properly shuffled and seated and thereafter a list of jury panel members was provided to the defense. Peter Eggert and Mr. Ottaway discussed the issue of requesting a shuffle, and, as trial strategy, the two of them agreed to proceed without requesting a shuffle, after a review of the jury information cards provided.

21. Based on the Court Reporter's Record, . . . during the joint trial, Attorney Andrew Ottaway objected to opinion testimony from witness, Jason Cashon, on the basis that the question asked for the witness' opinion on the ultimate question, and obtained a ruling from the trial court.

22. Based on the Court Reporter's Record, witness Jason Cashon was capable of being qualified as an expert and a fact witness.

23. Based on the Court Reporter's Record, Lee Roy Gaitan was not an accomplice to the offense of criminal conspiracy-fabricating physical evidence.

24. Based on the Court Reporter's Record, the State presented a substantial amount of testimonial evidence that connected Applicant to the commission of the offense charged, other than the testimony of Lee Roy Gaitan, and the record reveals no rational basis upon which the jury could have doubted or disregarded that evidence.

25. Based on the voir dire examination appearing in the Court Reporter's Record, . . . the testimony does not establish the name of the venireperson who identified her father as serving on the Grand

Jury, nor does such testimony establish that the venireperson's father participated in Applicant's indictment, that the venireperson held any bias against Applicant as a result of her father's service on the Grand Jury, or any other basis, pursuant to Article 35.16, CCP, for a challenge for cause.

26. Based on the credible affidavit of Attorney Andrew Ottoway, Mr. Ottaway personally contacted and interviewed all of the State's witnesses who would talk with him.

27. Based on the credible affidavit of Attorney Andrew Ottoway, until punishment was assessed, Applicant was in full agreement with Mr. Ottoway regarding trial strategy, the witnesses actually used at trial, and the witnesses Mr. Ottoway and Applicant elected not to have testify.

31. Applicant provides no proof in support of his allegations other than this sworn application and incorporated, purported "memorandum."

(State Habeas R. at 151-52)

Based on its findings, and applying the *Strickland* standard, the court entered the following legal conclusions and an order denying habeas relief:

5. Applicant . . . fails to sustain his burden to allege and prove facts which, if true, entitled him to relief.

6. Applicant . . . fails to plead and prove that the complained of error[s] did in fact contribute to his conviction or punishment.

7. Applicant fails to prove by credible evidence that

28

the cessation of employment of one of trial
counsel's employees, and the matters incident
thereto, occurred at the time of the preparation
and trial of Cause CR12121.  Applicant fails to
prove by credible evidence that the cessation of
employment of one of trial counsel's employees,
and the matters incident thereto, had any bearing
on his job performance as Applicant's attorney.
Accordingly, Applicant fails to prove by credible
evidence that trial counsel's performance was
deficient as a result of the cessation of
employment of one of trial counsel's employees,
and the matters incident thereto.

8.   Applicant fails to prove by credible evidence
     that, but for  the cessation of employment of one
     of trial counsel's employees, and the matters
     incident thereto, there is a reasonable
     probability the result of the trial would have
     been different.  Accordingly, Applicant fails to
     prove that the cessation of employment of one of
     trial counsel's employees, and the matters
     incident thereto, prejudiced his defense.

9.   Applicant fails to prove by credible evidence that
     any conflict of interest existed by virtue of
     trial counsel's potential employment with the
     District Attorney's office.  Applicant fails to
     prove by credible evidence that trial counsel's
     potential employment with the District Attorney's
     office had any effect upon his representation of
     Applicant or his performance as Applicant's
     attorney.  Accordingly, Applicant fails to prove
     by credible evidence that trial counsel's
     performance was deficient by failing to inform the
     trial court of potential employment with the
     District Attorney's office.

10.  Applicant fails to prove by credible evidence
     that, but for  trial counsel's failure to inform
     the trial court of potential employment with the
     District Attorney's office, there is a reasonable

probability the result of the trial would have
been different.  Accordingly, Applicant fails to
prove that trial counsel's failure to inform the
trial court of potential employment with the
District Attorney's office prejudiced his defense.

11.   Applicant fails to prove by credible evidence that
the defense's failure to request a shuffle of the
jury panel was not trial strategy.  Applicant
fails to prove by credible evidence that he did
not agree with the trial strategy of not
requesting a shuffle of the jury panel.
Accordingly, Applicant fails to prove by credible
evidence that trial counsel's performance was
deficient by failing to request a shuffle of the
jury panel.

12.   Applicant fails to prove by credible evidence
that, but for  trial counsel's failure to request
a shuffle of the jury panel, there is a reasonable
probability the result of the trial would have
been different.  Accordingly, Applicant fails to
prove that trial counsel's failure to request a
shuffle of the jury panel prejudiced his defense.

13.   Applicant fails to prove by credible evidence that
trial counsel's performance was deficient by
failing to object to opinion testimony from the
witness, Jason Cashon, on the basis that the
question asked for the witness' opinion on the
ultimate question.

14.   Applicant fails to prove by credible evidence
that, but for  trial counsel's failure to object
to opinion testimony from the witness, Jason
Cashon, on the basis that the question asked for
the witness' opinion on the ultimate question,
there is a reasonable probability the result of
the trial would have been different.  Accordingly,
Applicant fails to prove that trial counsel's
failure to make the foregoing objection prejudiced
his defense.

30

15.   Applicant fails to prove by credible evidence that
      Lee Roy Gaitan was, as a matter of law or a matter
      of fact, an accomplice to the offense charged.
      Accordingly, Applicant fails to prove trial
      counsel's performance was deficient by failing to
      request a jury instruction regarding Lee Roy
      Gaitan's status as an accomplice witness.

16.   Applicant fails to prove by credible evidence
      that, but for  trial counsel's failure to request
      a jury instruction regarding Lee Roy Gaitan's
      status as an accomplice witness, there is a
      reasonable probability the result of the trial
      would have been different.  Accordingly, Applicant
      fails to prove that trial counsel's failure to
      request a jury instruction regarding Lee Roy
      Gaitan's status as an accomplice witness
      prejudiced his defense.

17.   Applicant fails to prove that the Petit Jury
      foreperson was subject to a strike for cause
      during jury selection.  Accordingly, Applicant
      fails to prove trial counsel's performance was
      deficient by failing to object to the trial
      court's inclusion of the foreperson among the
      venire eligible for Petit Jury selection.

18.   Applicant fails to prove that trial counsel's
      failure to object to the trial court's inclusion
      of the foreperson among the venire eligible for
      Petit Jury selection prejudiced his defense.

19.   Applicant fails to prove by credible evidence that
      trial counsel failed to substantially interview
      the State's witnesses.  Accordingly, Applicant
      fails to prove trial counsel's performance was
      deficient by failing to substantially interview
      the State's witnesses.

20.   Applicant fails to prove by credible evidence
      that, but for any failure to substantially

interview the State's witnesses, there is a
reasonable probability the result of the trial
would have been different, or that such deficiency
prejudiced his defense.

21. Applicant fails to prove by credible evidence that
trial counsel misunderstood or was confused about
the applicable law for a criminal case.
Accordingly, Applicant fails to prove trial
counsel's performance was deficient as a result of
misunderstanding or being confused about the
applicable law for a criminal case.

22. Applicant fails to prove by credible evidence
that, but for trial counsel's misunderstanding or
being confused about the applicable law for a
criminal case, there is a reasonable probability
the result of the trial would have been different,
or that such deficiency prejudiced his defense.

23. Considering the totality of representation,
Applicant fails to prove by credible evidence that
trial counsel's representation fell below the
objective standard of professional norms and that
this deficient performance prejudiced his defense.

24. Considering the totality of representation,
Applicant fails to overcome the strong presumption
that trial counsel, Andrew Ottaway's conduct fell
within a wide range of reasonable professional
assistance, and that the challenged action might
be considered sound strategy.

(State Habeas R. at 152-55) (citations omitted)

The Eleventh Court of Appeals affirmed the trial court's

order denying habeas relief, and the Texas Court of Criminal

Appeals refused petitioner's petition for discretionary review

and overruled his motion for rehearing.  (11th COA Docket Sheet,

Case No. 11-05-00234-CR, entries for 7/6/2007 and 7/19/2007)

Petitioner has failed to rebut the state court's findings of fact

by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Thus,

the findings, including the court's credibility findings, are

entitled to a presumption of correctness.  *Richards v.*

*Quarterman*, 566 F.3d 553, 563-64 (5th Cir. 2009); *Galvan v.*

*Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002).  Deferring to those

findings, and having independently reviewed petitioner's claims,

it does not appear the state court's application of *Strickland*

was objectively unreasonable.

Petitioner's claims are largely conclusory with no legal

and/or evidentiary basis, refuted by the record, involve state

evidentiary rulings or other matters of state law, or involve

strategic and tactical decisions made by counsel, all of which

generally do not entitle a state petitioner to federal habeas

relief.  *See Wainwright v. Goode*, 464 U.S. 78, 83-84 (1983) ("It

is axiomatic that federal courts may intervene in the state

judicial process only to correct wrongs of a constitutional

dimension."); *Busby v. Dretke*, 359 F.3d 708, 715 (5th Cir. 2004)

("Strategic decisions . . . can rarely constitute ineffective

assistance of counsel, so long as they are based on reasonable

investigations of the applicable law and facts."); *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999) ("State evidentiary rulings do not warrant federal habeas relief unless they violate a specific constitutional right or render the trial so fundamentally unfair as to violate due process."); *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."); *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (ineffective assistance claims "based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain").

### 3. *Actual Innocence/Legal and Factual Impossibility*

Under petitioner's fourth ground, he claims that the Whiteley affidavits were merely drafts based on information he obtained from Lee Roy Gaitan and subject to change before they were useable for any purpose, that he was operating under the supervision of Joe Lopez, a licensed attorney, that the affidavits were never signed and/or notarized, thus no

34

"finalized" affidavit was ever produced, and that the affidavits could not have been used "to affect the outcome of the official proceeding" because they were not part of the record in Gallardo's appeal.  (Pet. at 16-19)  Thus, he asserts "the allegation against [him] was factually and legally impossible because, even if he would have been able to procure properly signed and notarized *affidavits*, he would only have been able to submit such to his supervising attorney . . . for any further use."  (*Id*. at 17) (emphasis in original)  He further asserts it was not clearly established "that the proposed *affidavits* were intended to be used in the aforesaid appeal because there were other potential proceedings where the *affidavits* would have had more value (such as the request for pardon from the Texas governor)," or that he had the intent to affect the proceedings because the affidavits were "not in the record before the court" in Gallardo's appeal.  (*Id*. at 18-19)

This claim presents a challenge to the sufficiency of the evidence to support petitioner's conviction.  To the extent petitioner challenges the factual sufficiency of the evidence, he does not allege a cognizable § 2254 claim.  For purposes of federal habeas corpus review, a state conviction need only satisfy the legal sufficiency standard set out in *Jackson v.*

*Virginia*, 443 U.S. 307 (1979).  *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005).  The inquiry in a legal-sufficiency analysis requires only that a reviewing court determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.  In conducting a *Jackson* review, a federal habeas court may not substitute its view of the evidence for that of the fact finder, but must consider all of the evidence in the light most favorable to the prosecution.  *Weeks v. Scott*, 55 F.3d 1059, 1061 (5th Cir. 1995).  Where a state appellate court has conducted a thoughtful review of the evidence, as in this case, its determination is entitled to great deference.  *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993).

Based on the evidence adduced at trial, the Eleventh Court of Appeals, applying the *Jackson* standard, held the evidence was legally sufficient to establish that the affidavits were intended for use with that court.  Specifically, the Eleventh Court of Appeals stated:

> Peter next argues that the evidence was legally or
> factually insufficient to establish his intent to

affect the Gallardo appeal because the Whiteley
affidavits could not have been considered by this
court.  The State responds that consideration of the
Whiteley affidavits by this court was not legally
impossible and that the language of Section 37.09 makes
this immaterial because the State was not required to
prove that the affidavits would or could have affected
the outcome of the Gallardo appeal.

We agree with the State.  Section 37.09 required
the State to prove that Peter conspired to make,
present, or use a document knowing that it was false
and with the intent to affect the course or outcome of
the Gallardo appeal.  The statute is silent on any
requirement that the State prove the attempt would have
succeeded, and we have found no case recognizing or
imputing such a requirement.  Moreover, we believe such
a requirement is inconsistent with the statute's plain
intent.  Our judicial system necessarily relies upon a
baseline belief in the sanctity of the process.  Any
attempt to use fabricated evidence–regardless of the
ultimate success of that attempt–is completely
inconsistent with not only the administration of
justice but with the integrity of the process.  The
statute recognizes this by outlawing a wide range of
activities whose mere presence could undermine
confidence in the judicial system.  It would make no
sense to say that an attempt to make, present, or use
fabricated evidence is any less culpable merely because
the attempt was poorly conceived.

The State was not required to prove that this
court could have considered the Whiteley affidavits or
that those affidavits would have affected the outcome
of the Gallardo appeal.  The State was merely required
to prove that Peter intended to affect the outcome of
the Gallardo appeal.

.   .   .

The evidence . . . establishes that the affidavits
were intended for use with this court.  On April 5,

2004, Gallardo filed a motion to extend the time for
filing his brief with this court.  That motion included
the following statement:

> Appellant's counsel has recently
> discovered new evidence which controverts the
> State's original allegations.  Appellant
> needs additional time to file his brief in
> order to document such new evidence.

> The only evidence of "new evidence" is the
> proposed Whiteley affidavits.  Furthermore, the motion
> indicates additional time was needed to "document" the
> new evidence.  Peter was then actively involved in
> obtaining signatures on the Whiteley affidavits.  There
> was no evidence of any other efforts to document new
> evidence.  This evidence is legally and factually
> sufficient to support the jury's verdict.

*Eggert*, 2007 WL 1644580, at *2 (footnotes and citations omitted).

The state court's adjudication of the claim is not

contrary to, or involve an unreasonable application of, *Jackson*

based on the evidence presented in the state courts.  Thus, the

state court's determination is entitled to the appropriate

deference and the presumption of correctness.

For the reasons discussed herein,

The court ORDERS the petition of petitioner for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby,

denied.

Pursuant to Rule 22(b) of the Federal Rules of Appellate

Procedure, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Court, and 28 U.S.C. § 2253(c), for the reasons discussed herein, the court further ORDERS that a certificate of appealability be, and is hereby, denied, as petitioner has not made a substantial showing of the denial of a constitutional right.

SIGNED May ____15____, 2012.

JOHN McBRYDE
UNITED STATES DISTRICT JUDGE